**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


|  |  |  |
|---|---|---|
| | * | |
| **ROBERT J. ENGLAND**, *et al.* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: RWT 10cv1256 |
| | * | |
| **MARRIOTT INTERNATIONAL, INC.,** | * | |
| *et al.* | * | |
| | * | |
| Defendants. | * | |


## MEMORANDUM OPINION

This putative class action involves ERISA claims by former employees of Marriott International, Inc. and its predecessor companies, who worked for Marriott for various periods from 1966 to 1991. Plaintiffs allege that they were given Retirement Deferred Stock Bonus Awards ("Retirement Awards") during their employment but Defendants have failed to pay retirement benefits under these awards, despite the fact that Plaintiffs have since reached retirement age. Further, Plaintiffs allege that the terms of the Awards violate ERISA and therefore must be reformed to comply with ERISA's minimum vesting requirements.

Defendants filed a motion to dismiss Plaintiffs' First Amended Complaint on August 20, 2010, arguing that the Amended Complaint must be dismissed because (1) Plaintiffs claims are time-barred; (2) Plaintiffs failed to exhaust their administrative remedies; (3) Plaintiffs may not simultaneously pursue claims under ERISA Sections 502(a)(1)(B) and 502(a)(3); and (4) Count I fails to state a claim as to employees who terminated employment with Defendants and their

corporate predecessors before ERISA's enactment. Defendants also argue that Plaintiffs' claim for breach of contract is preempted by ERISA.

The Court heard oral argument on December 20, 2010. For the reasons that follow, Defendants' motion to dismiss will be granted in part and denied in part.

## **BACKGROUND FACTS**

Plaintiffs Robert England, Dennis Bond, Lewis Foster, and Douglas Craig (collectively "Plaintiffs") worked for various corporate predecessors of Defendant Marriott International, Inc., including Marriott-Hot Shoppes, Inc., Marriott Corporation and their subsidiaries. Am. Compl. ¶ 1, ECF No. 39-1.

During their employment, Plaintiffs received Retirement Deferred Stock Bonus Awards ("Retirement Awards") which promised to issue stock to the recipients when they turned 65, took early retirement, became permanently disabled or died. *Id.* The four named plaintiffs in this action are recipients of Retirement Awards from Defendant Marriott International, Inc.'s various corporate predecessors. Plaintiff England, who worked for Marriott-Hot Shoppes and/or Marriott Corporation from 1966 through January 9, 1970, alleges he received Retirement Awards in 1966 and 1967 from Marriott-Hot Shoppes and in 1968 from Marriott Corporation. *Id.* ¶ 50. Plaintiff Bond was employed by Marriott Corporation from 1971-1991, during which time Marriott Corporation issued him "a number of Retirement Awards." *Id.* Plaintiff Foster was employed by Marriott Corporation from September 1974 to November 1976, during which time he received "at least one Retirement award," *id.* ¶ 69, and Plaintiff Craig was employed by Marriott Corporation from 1977-1987, during which time the company issued him "a number of Retirement Awards." *Id.* ¶ 74.

Each plaintiff alleges that he only received a paper copy of the Retirement Award at the time the award was given, that the paper award apprised him of the number of shares of Marriott-Hot Shoppes or Marriott Corporation stock he had been awarded along with the terms and conditions governing accrual, vesting, and eventual distribution of stock, and that he did not receive any additional information in the form of plan documents or Summary Plan Descriptions thereafter. *Id.* ¶ 51, 60, 70, 75. Plaintiff England's awards indicated that his shares would vest "pro rata" while Plaintiff Bond's Retirement Awards provided that his shares would vest on a pro-rata annual basis. *Id.* ¶¶ 57, 61. All four named plaintiffs have since turned 65 and Defendants have not contacted them to inform them of their entitlement to distributions under their Retirement Awards. *Id.* ¶¶ 53, 68, 73, 75, 78.

At the time the employees received their Retirement Awards, they became participants in the Marriott-Hot Shoppes, Inc. Deferred Stock Bonus Plan or the Marriott Corporation Deferred Stock Plan. *Id.* ¶ 1. Plaintiffs allege that the Marriott International, Inc. Stock and Cash Incentive Plan, a Defendant in this action, subsequently assumed all obligations under the Retirement Awards and is failing to honor its obligations because it has not issued stock to Award recipients or has issued them less stock than that to which they are entitled. *Id.*

Marriott-Hot Shoppes issued Retirement Awards to employees between 1963 and 1968, at which time Marriott-Hot Shoppes changed its name to Marriott Corporation, *id.* ¶ 11, and Marriott Corporation issued Retirement Awards to its employees between 1968 and 1993. *Id.* When they received their Retirement Awards from Marriott-Hot Shoppes, recipients became participants in the Marriott-Hot Shoppes, Inc. Deferred Stock Bonus Plan. *Id.* ¶ 12. When Marriott-Hot Shoppes became Marriot Corporation, the recipients of prior awards became

participants in the Marriott Corporation Deferred Stock Plan, along with recipients of awards from Marriott Corporation. *Id.*

The Retirement Awards provided that the awarded shares would vest pro-rata during the course of the recipient's employment until company approved early retirement, retirement at age 65, disability or death. *Id.* ¶ 17. Employees who had vested in any portion of their Retirement Awards remained participants in the Deferred Stock Plan even if they terminated employment with the company. *Id.* ¶ 15. The accrual terms of the Retirement Awards provided that awarded shares would participate, until final payout, in dividends, stock splits, spin-offs and reclassifications of the Marriott-Hot Shoppes/Marriott Corporation stock in order to prevent dilution of the shares from market transactions. *Id.* ¶ 18. The distribution terms of the Retirement Awards provided that vested stock would be distributed to recipients over a ten year period following retirement, disablement, death, or age 65. *Id.* ¶ 19. The Retirement Awards contained a number of conditions, including that the employee's shares, including vested shares, would be forfeited if the recipient failed to maintain a valid current address with the Plan Administrator, competed with any Marriott business after retirement or termination, or committed any criminal offense or malicious tort against the company. *Id.* ¶ 20. The Retirement Awards did not contain a provision reserving for Marriott companies or the Plan administrator the discretion to interpret the terms of the Retirement Awards. *Id.* ¶ 21.

Plaintiffs allege that after the passage of ERISA, which became effective in 1976, the Retirement Award program became subject to and governed by ERISA's provisions, which govern "employee pension benefit plans" and "pension plans" as defined by 29 U.S.C. § 1002(2)(A). *Id.* ¶ 23. Plaintiffs further allege that the Retirement Awards were given to a large portion of the salaried workforces of Defendants' predecessor companies and were not limited to

a subgroup of employees at one compensation level. *Id.* ¶ 24. Despite the fact that the Retirement Awards were subject to ERISA, Defendants and their predecessor companies never informed Plan participants, the Department of Labor or the IRS that the Retirement Award program was an ERISA-governed plan. *Id.* ¶ 25. Defendants never complied with the reporting and disclosure requirements or the vesting schedule mandated by ERISA. *Id.* ¶ 26.

In 1993, Marriott Corporation underwent a reorganization, spun off of its subsidiaries into a new company called Marriott International, Inc., and renamed the remaining company Host Marriott Corporation. *Id.* ¶ 27. As part of the reorganization, Marriott International, Inc. agreed to assume the obligations and liabilities for the Retirement Awards issued by Marriott-Hot Shoppes and Marriott Corporation to three classes of individuals: (1) former employees of Marriott-Hot Shoppes or Marriott Corporation who left the company before the 1993 reorganization; (2) former employees of either of these companies who became employees of Marriott International, Inc.; and (3) former employees of either of these companies who became employees of Host Marriott Corporation and elected to receive their future benefits under their Retirement Awards in the form of Marriott International, Inc. stock. *Id.* ¶¶ 27-28. The Retirement Awards assumed under this arrangement were converted to provide recipients with benefits in the form of Marriott International, Inc. stock. *Id.* ¶ 29. These awards were called 1993 Conversion Awards. *Id.*

Immediately after its spin-off, Marriott International, Inc. established the Marriott International Inc. 1993 Comprehensive Stock Incentive Plan. *Id.* ¶ 30. Marriott International agreed to administer and distribute benefits under the 1993 Conversion Awards in accordance with the terms of the original Retirement Awards and the terms of the old Deferred Stock Plan that had existed under Marriott-Hot Shoppes and later Marriott Corporation. *Id.* Employees who

were not employed by the predecessor companies in 1993 were not informed of or provided documents addressing the transfer of the former Deferred Stock Plan to Marriott International, Inc., nor were they informed of the conversion of their Retirement Awards into 1993 Conversion Awards or their options arising from reorganization. *Id.* ¶ 31. In other words, Marriott International Inc. did not proactively communicate with former employees who had received Retirement Awards regarding the impact of the reorganization on their retirement benefits. *Id.* ¶ 32. After the 1993 reorganization, Marriott International, Inc. did not have a written or formal claims procedure for benefits due under the Retirement Awards, or an appeals procedure for the denial of benefits due under Retirement Awards. *Id.* Plaintiffs allege Marriott International, Inc. also continued to conceal from Plan participants, the Department of Labor and the IRS that the Retirement Award program was governed by ERISA. *Id.*

In 1998, Marriott International, Inc. underwent a second reorganization that resulted in the spin-off of a new company, also called Marriott International, Inc., which is a Defendant in this lawsuit. The remaining company was renamed Sodexho Marriott Services, Inc. ("Sodexho") *Id.* ¶ 33. The new Marriott International, Inc. again agreed to assume the obligations and liabilities for the Retirement Awards issued by its predecessor companies, except with regard to recipients who became Sodexho employees. *Id.* ¶ 34. Employees who had previously received Retirement Awards who became part of Sodexho were issued all vested shares due to them under the Retirement Awards prior to the 1998 reorganization, and were issued cash for shares under the Retirement Awards that had not yet vested. *Id.* ¶ 35. The Retirement Awards for which the new Marriott International, Inc. assumed obligations of its predecessor were converted to provide Retirement Award recipients with benefits in the form of stock of the new Marriott International, Inc. *Id.* ¶ 36. Twenty-one million shares of both Marriott common stock and Marriott A

common stock were reserved in order to satisfy the company's obligations under the "1998 Conversion Awards." *Id.* The new Marriott International, Inc. established the Marriott International, Inc. 1998 Comprehensive Stock and Cash Incentive Plan, which eventually became the Marriott International, Inc. Stock and Cash Incentive Plan, the second Defendant in this action. *Id.* ¶ 37. The new company agreed to administer and distribute benefits under the 1998 Conversion Awards in accordance with the terms of the original Retirement Awards and the terms of the Marriott-Hot Shoppes/Marriott Corporation Deferred Stock Plans. *Id.* Plaintiffs allege that recipients of Retirement Awards not employed by Defendant at the time of the 1998 reorganization were not informed of or provided documents addressing the conversion of their awards or their options arising from the reorganization. *Id.*

Plaintiff England turned 65 on March 30, 2006 and shortly thereafter made an informal inquiry regarding his benefits under the Retirement Awards. *Id.* ¶ 53. Tracy Vance, Manager of Stock Plan Operations for Defendant Marriott International, Inc. responded to England by a letter in which Vance conceded that some shares of stock associated with the Retirement Awards had vested prior to England's separation from Marriott Corporation in 1970, but refused to issue him any stock on the basis of a purported "plan practice" in 1970 of distributing accounts valued under $3,500 at the time of separation from employment. *Id.* ¶ 55. Plaintiffs allege that this plan practice did not come into effect until some two decades after England separated from the company. *Id.*

England's attorney responded to Vance's letter by making a formal demand for stock owed England under the Retirement Awards. *Id.* ¶ 56. In its response to that letter, Marriott acknowledged that England had never received a distribution in 1970, and offered to distribute stock to England if he signed a release of all claims against Defendant Marriott and its

predecessors. *Id.* at ¶ 57. Marriott offered England adjusted vested shares based on its calculation that 3.41 shares had vested to England's benefit before his separation from Marriott Corporation. *Id.* This calculation was based on Marriott's interpretation that the vesting provision in England's Retirement Awards called for annual vesting. *Id.* England refused the offer and argued that the term "pro rata" vesting meant monthly, not annual, vesting. *Id.* at ¶ 58. Marriott, through Vice President and Senior Counsel Gordon Klepper, responded to England stating that Marriott's stock award administrator had always maintained sole authority to interpret the terms of the stock awards, and that the administrator had consistently applied annual vesting for all Deferred Stock bonus awards. *Id.* at ¶ 59.

Defendant Marriott International, Inc. controls Defendant Marriott International, Inc. Stock and Cash Incentive Plan, and Plaintiffs allege that Defendants are liable for (1) failing to bring the Retirement Awards distribution plan into compliance with ERISA; (2) failing to proactively distribute retirement benefits to Award recipients who have become eligible for distribution; (3) failing to communicate with or distribute necessary documentation to recipients of Retirement Awards regarding the impact of corporate reorganizations on their benefits; (4) maintaining a policy of denying that they had any obligation or liability to distribute benefits to Retirement Award recipients; (5) distributing stock due to Retirement Award recipients in a manner violative of ERISA and the terms of the Retirement Awards; (6) failing to establish a formal or written claims procedure or appeals procedure for denial of Retirement Award benefits; and (7) improperly calculating distributions to Retirement Award recipients. Am. Compl. ¶¶ 41-49.

Defendants did not implement a formal or written claims procedure, or an appeals procedure for the denial of benefits due under the Retirement Awards, until March 3, 2010, after Plaintiffs had instituted this lawsuit. Am. Compl. Ex. A at 6. ECF No. 42-2.

The First Amended Complaint contains three counts: Count I alleges that the vesting scheme established in Plaintiffs' Retirement Awards violates the minimum vesting requirements of 29 U.S.C. § 1053(a). Am. Compl. ¶¶ 88-92. Plaintiffs therefore seek injunctive and other equitable relief pursuant to 29 U.S.C. § 1332 (a)(3): (1) declaring that the Retirement Awards program is an employee pension benefit plan governed by ERISA; (2) declaring that the vesting terms of the Retirement Awards violate 29 U.S.C. § 1053(a); (3) enjoining Defendants from administering the Retirement Awards, calculating the benefits due under those awards, and distributing benefits due under those awards in a manner that violates 29 U.S.C. § 1053(a); (4) reforming the terms of the Retirement Awards so that they comply with 29 U.S.C. § 1053(a); and (5) ordering Defendants to recalculate the benefits owed to all Retirement Award holders using ERISA-compliant vesting terms. *Id.* at 23-24.

Count II seeks declaratory relief and the distribution of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B). *Id.* at 24-26. Specifically, Plaintiffs seek (1) a declaration that the Retirement Awards program is an employee pension benefit plan that is governed by ERISA; (2) a declaration that Defendants are obligated to distribute proactively benefits to all Retirement Award holders eligible for distributions; and (3) an order requiring Defendants to distribute benefits to all Retirement Award recipients. *Id.*

Count III asserts a breach of contract claim and alleges that Defendants and their predecessor companies materially breached their obligations under the Retirement Awards by not distributing benefits under the Retirement Awards to Plaintiffs and class members,

improperly calculating the number of vested shares due to Retirement Award recipients, and improperly accounting for market events in calculating the number of adjusted shares due to Retirement Award holders. *Id.* at 27-28. Count III is pled in the alternative to the ERISA claims raised in Counts I and II.

Plaintiffs seek certification of this action as a class action under Fed. R. Civ. P. 23 and the appointment of Plaintiffs as class representatives, but have not yet made a motion for class certification.

## **PROCEDURAL HISTORY**

On January 19, 2010, Plaintiffs filed a three-count complaint in the United States District Court for the District of Columbia, alleging violations of 29 U.S.C. § 1053 (establishing ERISA's minimum vesting schedule); seeking declaratory relief and benefits under ERISA, 29 U.S.C. § 1332 (a)(1)(B); and alleging breach of contract due to Defendants' non-payment of retirement benefits. ECF No. 1. On March 4, 2010, Defendants moved to transfer the case from the District Court for the District of Columbia to this Court. ECF No. 10. In support of their motion to transfer, Defendants asserted that a case filed by Plaintiff England which encompassed the same issues as the District of Columbia case was pending before Judge Peter J. Messitte of this Court (Case No. 10cv0331). On May 17, 2010, the case was transferred to this Court. ECF No. 26. On June 22, 2010, the Court ordered Defendants to move, answer, or otherwise respond to the complaint on or before June 30, 2010 and further directed Plaintiffs to file any amended complaint on or before July 21, 2010. ECF No. 37.

On June 30, 2010, Defendants moved to dismiss the complaint and on July 21, 2010, Plaintiffs moved to file an amended complaint. The Court granted Plaintiffs' motion for leave to amend the complaint and denied Defendants' motion to dismiss as moot on July 22, 2010. ECF

No. 41.  Defendants moved to dismiss the First Amended Complaint on August 20, 2010.  The motion was fully briefed and a hearing was held on December 20, 2010.

## STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss, the Court must therefore consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the Plaintiff, *see Lambeth v. Bd. of Comm'rs of Davidson County*, 407 F.3d 266, 268 (4th Cir. 2005).  Nevertheless, the Court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002).

## ANALYSIS

Defendants move to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on six grounds.  First, Defendants argue that Count I and Count II are

claims for benefits under ERISA Section 502(a)(1)(B) and Plaintiffs failed to exhaust their administrative remedies, a prerequisite to bringing suit under this section of ERISA. Second, Defendants argue that Count II does not state a claim for equitable relief and Plaintiffs cannot simultaneously maintain claims under ERISA Sections 502(a)(3) and 502(a)(1)(B). Third, Defendants argue that Count I fails to state a claim on behalf of any member of the alleged class who terminated employment prior to ERISA's enactment. Defendants also argue that Count I is barred by the statute of limitations as to all members of the putative class, and all counts are barred by the statute of limitations with respect to members of the alleged class who were paid any benefits more than three years prior to the filing of the initial Complaint. Finally, Defendants argue that Plaintiffs' breach of contract claim must be dismissed because it is preempted and precluded by ERISA.

## I.    Statute of Limitations

Defendants argue that Count I is barred by the statute of limitations because the Retirement Awards that Plaintiffs complain fail to comply with ERISA's vesting requirements were issued between 1963 and 1993, between 17 and 47 years before the initial complaint in this case was filed. Defendants reason that the terms of the Retirement Awards, including the offending vesting provisions, were included in the awards themselves, and Plaintiffs therefore knew of the terms at least 17 years before filing the initial complaint. Plaintiffs' vesting claims, they conclude, are time-barred.

A motion to dismiss under Rule 12(b)(6), "which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Goodman v. Praxair, Inc.*, 494 F. 3d 458, 464 (4th Cir. 2007).

Courts may, however, consider the statute of limitations defense in a 12(b)(6) motion if the facts necessary to the defense "clearly appear on the face of the complaint." *Id.*

ERISA does not contain an explicit statute of limitations for claims brought pursuant to Section 502(a)(3). *Romero v. Allstate Corp.*, 404 F. 3d 212 (3d Cir. 2005). Where ERISA provides no explicit statute of limitations for a given cause of action, the court must refer to the forum state's laws and apply the most analogous statute of limitations. *Shofer v. Hack Co.*, 970 F. 2d 1316, 1319 (4th Cir. 1992). The Court agrees with the parties that the most analogous statute of limitations is Maryland's statute of limitation for breach of contract actions, which provides for a three-year statute of limitations. *Id.* (citing Md. Code Ann. Cts. & Judic. Proc. § 5-101).

Even where the court applies the forum state's statute of limitations, it must "treat the time at which the statute begins to run as governed by a uniform federal rule rather than the laws of the states." *White v. Sun Life Ins. Co. of Canada*, 488 F. 3d 240, 245 (4th Cir. 2007). The statute of limitations "clock generally begins to run at the time the plaintiff can first file suit." *Id.*

In an ERISA case, a cause of action generally does not accrue until a claim for benefits is made and formally denied. *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir. 1989). However, the Third Circuit has held that an ERISA cause of action may accrue later if the plaintiff had no reason to know of his injury at the time it occurred. *See, e.g., Romero v. Allstate Corp.*, 404 F. 3d 212, 222 (3d Cir. 2005). Pursuant to the "discovery rule," the Third Circuit held, an ERISA claim will accrue only "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis of the claim." *Id.* Still other courts have held that the statute of limitations may begin to run earlier than the date on which benefits are denied if there is an event that constitutes a "clear repudiation" of the participant's rights under

ERISA.  *See Carey v. Int'l Board of Elec. Workers Local 363 Pension Plan*, 201 F. 3d 44, 48 (2d Cir. 1999), *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 2010 WL 3122795, at *3 (7th Cir. Aug. 10, 2010), *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521 (3d Cir. 2007).

Defendants cite *Bilello v. JPMorgan Chase Retirement Plan*, 607 F. Supp. 2d 586 (S.D.N.Y. 2009) in support of their argument that the claims asserted in Count I accrued when plaintiffs were awarded their Retirement Awards because the vesting terms they now claim violate ERISA were contained on the face of those Awards.  Defs.' Mot. to Dismiss at 28.  In other words, the "terms of the 'Retirement Awards' contain the very terms that Plaintiffs claim violate ERISA" so plaintiffs became aware of the ERISA violation, at the latest, 17 years ago. *Id.* (citing Am. Compl. ¶¶ 89, 90, 91, 92).

In *Bilello*, the District Court for the Southern District of New York held that "where the [ERISA] plan documents themselves, rather than their application, are at issue, the statute of limitations for [plaintiff's] ERISA claims accrues when he discovered or with reasonable due diligence could have discovered the deficiencies in the plan documents of which he complains." *Bilello*, 607 F. Supp. 2d at 593.  The court held that plaintiff's claim that a plan amendment violated ERISA accrued when plan participants were "given notice of an amendment that contain[ed] a clear repudiation of the benefit terms to which [plaintiff] claim[ed] he [was] entitled." *Id.*  The *Bilello* court noted that the thrust of plaintiff's claim was that the formula used by his ERISA plan to calculate his "cash balance" violated ERISA because it did not specify a minimum interest rate. *Id.* at 595-96.  The court found that the plan documents themselves did not specify a minimum interest rate or suggest the existence of such a rate; therefore, plaintiff was on notice that his claim, predicated on that absence of such a rate, began to accrue when he received the plan documents showing the absence of such a rate. *Id.*  The

*Bilello* court concluded that because plaintiff's ERISA plan document apprised him of the basis of his claim, the statute of limitations clock began to run upon plaintiff's receipt of that plan document. His claims were therefore time-barred. Similarly, the Eighth Circuit has held that plan participants' receipt of a "fact sheet" containing the "challenged terms" put the participants on notice of their ERISA claim and started the statute of limitations clock running. *Union Pac. R. Co. v. Beckham*, 138 F. 3d 325, 331 (8th Cir. 1998).

Plaintiffs Amended complaint alleges that Defendants "conceal[ed] the ERISA status of the Retirement Awards" and therefore "the mere notice of the terms of the Awards did not alert Plaintiffs to their ERISA injury, and it did not constitute a clear repudiation of their rights under ERISA." Pls.' Opp'n at 41. Plaintiffs argue that "[w]here the ERISA status of a plan is uncertain, courts have rejected the argument that mere notice of plan terms constitutes a clear repudiation of rights under ERISA." Pls.' Opp'n at 40. In support of this proposition, Plaintiffs cite *Fenwick v. Merrill Lynch & Co., Inc.* 570 F. Supp. 2d 366 (D. Conn. 2008).

In *Fenwick*, the court held that a complaint was not time-barred where plaintiffs did not receive a summary plan description communicating the terms of the purported "top hat plan" to plaintiffs, and the "plaintiffs had no notice that the terms of the [purported top hat] Plan repudiated their entitlement to accrued benefits because they had no knowledge of the Plan terms as a whole *or whether the Plan was subject to ERISA*." *Id.* at 372 (emphasis added). Where there was "no evidence indicat[ing] that plaintiffs received or should have known information regarding either the Plan['s ERISA] status or the Plan participants prior to their termination of employment," the plaintiffs did not have knowledge of a "clear repudiation of benefits to which they now allege entitlement until they terminated their employment." *Id.* The court concluded that the plaintiffs' claims did not accrue when they received notice of the non-ERISA compliant

forfeiture provisions. *Id.* This Court finds *Fenwick*'s reasoning persuasive, and concludes that where an employer denies that a plan is subject to ERISA, a claim that the plan violates ERISA does not accrue when plaintiffs receive notice of non-ERISA compliant plan terms.

Defendants attempt to distinguish *Fenwick* on the grounds that that case involved a claim of breach of fiduciary duty and a claim for benefits, rather than a claim for equitable relief under Section 502(a)(3). Defs.' Reply at 6. The Defendants' purported distinction is a classic distinction without a difference. It is true that the *Fenwick* court applied a statutorily prescribed "actual knowledge" test when analyzing when the statute of limitations began to run with respect to the plaintiffs' breach of fiduciary duty claim, but this fact does not undercut the applicability of the court's analysis to the facts of this case.

Here, the ERISA status of the Retirement Awards was unclear for many years; indeed, Defendants still do not concede that the Retirement Awards are subject to ERISA. Under these facts, a rule that ties the date of accrual to the date the Retirement Awards were given would "have the undesirable effect of requiring plan participants and beneficiaries likely unfamiliar with the intricacies of pension plans formulas and the technical requirements of ERISA to become watchdogs over potential plan errors and abuses." *Romero*, 404 F. 3d 212, 224 (3d Cir. 2005). The Amended Complaint does not allege exactly when Plaintiffs became aware that ERISA governed the Retirement Awards. It seems clear, however, that Plaintiffs were not aware that the Retirement Awards were subject to ERISA's requirements at the time ERISA was passed. Plaintiffs apparently were not aware that ERISA governed the awards until at least February, 2010, when Defendants removed Plaintiff England's state court breach of contract claim on the ground that ERISA governed England's award. *See* Notice of Removal, Pls.' Opp'n, Ex. 5.

To conclude that Plaintiffs' claims accrued while their employer was actively denying ERISA's applicability to their Retirement Awards would make no sense and would undermine ERISA's underlying purposes of promoting the interests of employees and protecting their contractually defined retirement benefits. *Romero*, 404 F.3d at 224. Such a rule would "impose an unfair duty of clairvoyance on employees" who allege that the detrimental effect on them by their employer's non-compliance with ERISA was not apparent during the many years in which their employer denied ERISA applied to their retirement plan. It would be a disservice to deem a claim to have accrued before plaintiff's knew or should have known that their plans were governed by ERISA.

It is important to note what the Retirement Awards did not contain to see why there were simply no "red flags" which should have alerted Plaintiffs to the fact that ERISA governed these Awards and, consequently, that they might have claims for the Awards' failure to comply with ERISA. The Retirement Awards did not even mention ERISA, did not indicate how Defendants intended to calculate a year of service and did not indicate how participants could be apprised of Plan amendments; the awards did not indicate how Plaintiffs' shares would be converted when obligations under the Retirement Awards were assumed by successor companies and they contained no details regarding any claims procedures (because there were none until *after* this complaint was filed). Summary Plan Descriptions were never provided to Plaintiffs with respect to the Awards and the Department of Labor and the IRS were never informed of the ERISA status of the Retirement Awards. *See* Am. Compl. ¶ 25. If Defendants, the Department of Labor and the IRS had no reason to know that these awards were subject to ERISA until at least 2010, then surely the Plaintiffs had no reason to know that these awards were governed by ERISA until then.

In *Cotter v. ECT Retirement Plan*, the Fourth Circuit noted that it might be anomalous if an ERISA claim accrued only once an ERISA lawsuit was filed. 898 F.2d 424, 429 (4th Cir. 1990). However, in an unusual case such as this one, in which both the Plaintiffs and their former employers believed a retirement plan was *not* subject to ERISA, that anomaly may here be the reality. In any event, the Court cannot conclude from the face of the Amended Complaint that Plaintiffs' claims, as articulated in Count I, accrued more than 3 years before the initial complaint in this suit was filed. Dismissal on statute of limitations grounds is therefore inappropriate at this time.[1]

## II. Failure to Exhaust Administrative Remedies

Defendants argue that Counts I and II must be dismissed because Plaintiffs failed to pursue and exhaust their administrative remedies before bringing this lawsuit. Defs.' Mot. to Dismiss, ECF No. 42-1 at 20. This argument is not even a "close call." Though it is true that ERISA plan participants must "both pursue and exhaust [ERISA] plan remedies before gaining access to the federal courts," *Gayle v. UPS*, 401 F. 3d 222, 226 (4th Cir. 2005), Defendants did not implement an administrative claims procedure until *after* this lawsuit was filed. Plaintiffs instituted this lawsuit in January, 2010, and Defendants did not implement a claims procedure or an appeals procedure for the denial of benefits due under the Retirement Awards until March 3, 2010. Am. Compl. Ex. A at 6. ECF No. 42-2.

In *Eastman Kodak Co. v. STWB, Inc.*, the Second Circuit held that, "under the 'deemed exhausted' provision of [Department of Labor regulation] 29 C.F.R. § 2560.503.1(*l*), an ERISA benefits claimant is not required to exhaust a claims procedure that was adopted only after a suit

---

[1] Defendants also argue that the statute of limitations has run on Counts I-III with respect to any members of the putative class who received Retirement Award payments more than three years before the initial complaint was filed. Defs.' Mot. to Dismiss at 33. The Court concludes that a "motion to dismiss 'is not an appropriate time to consider the impact of a statute of limitations defense on absent class members.'" *Guerra v. GMAC LLC*, 2009 WL 449153 (E.D. Pa. Feb. 20, 2009). That is especially so when no class certification has yet occurred.

to recover benefits has been brought." 452 F. 3d 215, 223 (2d Cir. 2006). The "deemed exhausted" provision of 29 C.F.R. § 2560.503.1(*l*) provides, in pertinent part,

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

The Second Circuit noted that interpreting the "deemed exhausted" provision to allow a company to compel litigants to exhaust an administrative procedure that was only implemented after they had filed a lawsuit would "force claimants, first, to resort to litigation to obtain their benefits, and then, to abandon their suit at whatever point (prior to final judgment) the plan adopted a claims procedure." *Id.* at 222. The Second Circuit looked at the context in which the "deemed exhausted" provision was adopted and held that "[t]he 'deemed exhausted' provision was plainly designed to give claimants faced with inadequate claims procedures a fast track into court—an end not compatible with allowing a 'do-over' to plans that failed to get it right the first time." *Id.* The Second Circuit held that the litigants' administrative remedies should be "deemed exhausted" due to the Defendant's failure to provide them with an adequate claims procedure until after they brought suit to recover their ERISA benefits in court.

This Court finds the reasoning of *Eastman Kodak* to be highly persuasive. Defendants in this case instituted a claims procedure and appeals process for denial of benefits under the Retirement Awards less than two months *after* Plaintiffs filed this suit. It appears Defendants were motivated to institute a formal claims procedure only after they were sued. To allow Defendants to require Plaintiffs, who have incurred the expense of investigating the grounds for and filing this suit, to go back and exhaust an administrative procedure that may never have been

implemented but for their lawsuit would completely undermine the "deemed exhausted" provision of 29 C.F.R. § 2560.503.1(*l*).  If companies could wait until they were sued to establish a claims procedure, and then force litigants to go back and bring their claims through that procedure, there would simply be no incentive for them to institute an ERISA-compliant procedure in the first instance.  The Court therefore concludes that Plaintiffs' administrative remedies are "deemed exhausted" because Defendants' administrative procedure for bringing ERISA claims and appealing denials of ERISA benefits was only implemented after this litigation commenced.[2]

Defendants attempt to distinguish *Eastman Kodak* on the ground that "the *Kodak* case was not a class action and the concern for varying claims, decisions and interests was nonexistent" in that case whereas here, four plaintiffs who worked for Defendants in different years assert claims involving Retirement Awards that contained different terms.  Defs.' Reply at 16-19.  Exhaustion of administrative remedies is even more important in this case than in *Kodak*, Defendants assert, because the administrative process is necessary to develop the factual record regarding each plaintiff's claims, and requiring plaintiffs to complete the administrative process would advance the congressional intent "to minimize the number of frivolous lawsuits, promote consistent claims administration and judicial economy, and decrease the cost and times of claims settlement."  Defs.' Reply at 20.

White it may be true that an administrative claims procedure would have benefitted the parties by allowing for the development of a factual record, and potentially avoiding this litigation, Defendants are the ones who failed to provide an administrative claims procedure

---

[2] *Eastman Kodak* has recently been cited positively by one of our sister courts in the Fourth Circuit.  *See, e.g.*, *King v. United Way of Central Carolinas, Inc.*, 2010 WL 3636151 at *3 (W.D. N.C. Sept. 15, 2010) (administrative remedies deemed exhausted where ERISA-compliant claims procedure was implemented after litigation was initiated).

which would have allowed for this factual development and efficient resolution of claims, and they should not be allowed to take unfair advantage of their own violation of the law. They cannot now argue that the Court should strictly enforce the exhaustion of administrative remedies under a procedure which they earlier refused to implement. The policy concerns outlined in *Eastman Kodak* are no different in this case than in a non-class action. The Court will not allow Defendants to force claimants to complete an administrative claims process after they essentially refused to provide such a process before this suit was brought.

Defendants attempt to distinguish *Eastman Kodak*, arguing that the case of *Kern v. Verizon* Communications, 381 F. Supp. 2d 532, 536 (N.D. W. Va. 2005), is more applicable to the facts of this case. In *Kern*, the court rejected Plaintiffs' argument that the exhaustion requirement should be waived because their employer failed to comply with ERISA's notice provisions, which required their employer to notify them of either the denial of their benefits claims or the procedures available to challenge that denial. *Kern*, 381 F. Supp. 2d 532, 536 (N.D. W. Va. 2005). The *Kern* court held that plaintiffs had not shown that the pursuit of administrative remedies would be "futile" or "clearly useless" and therefore the exhaustion requirement would not be waived. *Id.* (citing *Hickey v. Digital Equip. Corp.*, 43 F. 3d 941, 945 (4th Cir. 1995) (to circumvent exhaustion requirement plaintiffs had to make "clear and positive showing of futility").

*Kern* is not even remotely applicable to the facts of this case. *Kern* involved an ERISA plan's failure to give plaintiffs *notice* of the pre-existing administrative procedure they were required to exhaust—not the complete and total failure of an employer's ERISA plan to establish an administrative claims procedure at all, as in this case. There simply was no claims procedure to exhaust at the time Plaintiffs filed the instant suit. The small, technical noncompliance at

issue in *Kern* is simply not comparable to the complete non-existence of any formal claims procedure in this case.

Defendants also make an essentially factual argument that Plaintiffs Craig, Bond and Foster should be required to exhaust administrative remedies because they did not make any inquiry of Marriott about their benefits before filing this action. *See* Defs.' Mot. to Dismiss, ECF No. 42-1 at 17, Defs.' Reply, ECF No. 48 at 15. It appears that only Plaintiff England made any inquiry of Defendants or demand that they pay benefits under the Retirement Awards. Defs.' Mot. to Dismiss at 17. ECF no. 42-1. Plaintiffs Craig, Bond and Foster apparently did not make any claim, formal or informal, on Defendants for the distribution of benefits owed them under the Retirement Awards. However, requiring Craig, Bond, and Foster to exhaust administrative remedies also would be inequitable for two reasons.

First, there is no reason to believe Craig, Bond and Foster, had they inquired of Marriott regarding their benefits, would have been given any other response than that given England. England was told he was not entitled to benefits because those benefits had been paid out when he separated from Marriott; then, after his attorney made a demand for the benefits, he was told he would be given certain stock if he signed a release of all claims. Pls.' Opp'n at 12-14. At no time was England told of an administrative claims process through which he could seek payment of benefits under the Retirement Awards. *Id.* There is no reason to believe that, had Craig, Bond and Foster inquired of Marriott regarding payment of Retirement Award benefits, they would have been told to pursue an administrative claims process that *did not then exist*.

Second, the policy implications outlined in *Eastman Kodak* persuade the Court that to allow Defendants to now compel Plaintiffs Craig, Bond and Foster to complete an administrative claims process would create a perverse incentive for a company to delay implementing an

ERISA-compliant claims procedure until litigation was initiated. The exhaustion requirement is designed to require utilization of extant administrative processes, not to wear out employees with after-the-fact diversions and detours.

### III. Failure to State a Claim for Equitable Relief

Defendants argue that Count I should be dismissed because it fails to state a claim for equitable relief, and that even if it does, the equitable relief it seeks may not be granted. Defendants argue that even though Plaintiffs purport to seek equitable relief under Count I, they really seek legal relief, because they seek the payment of benefits. Defs.' Mot. to Dismiss at 21. Further, Defendants argue that even if Plaintiffs are seeking "equitable relief" in connection with reformation of the Retirement Awards, they cannot simultaneously seek equitable relief under ERISA Section 502(a)(3) and legal relief under ERISA Section 502(a)(1)(B) because the Supreme Court's decision in *Varity Corp. v. Howe*, as interpreted by the Fourth Circuit in *Korotynska v. Metropolitan Life Ins. Co.*, prohibits a plaintiff from simultaneously seeking relief under both sections of ERISA.

Under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), plan participants or beneficiaries may sue to "(A) enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." Under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), an ERISA plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

Defendants argue that though Plaintiffs purport to seek equitable relief in Count I, this claim is actually a claim for legal relief. Specifically, Defendants argue that "[a]lthough

Plaintiffs purport to seek equitable remedies of '[e]njoining Marriott and the Marriott Plan' from administering the 'Retirement Awards' in a manner which they allege violates ERISA's vesting requirements and a 'reformation of the terms of the Retirement Awards to comply with the allegedly applicable vesting requirements of ERISA,' it is clear that in substance they seek legal relief: payment of additional shares of stock and a declaration of rights to additional shares of stock, both of which are remedies available under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), not ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)." Defs.' Mot. to Dismiss at 21. ECF Bi, 42-1. Plaintiffs counter that the payment of benefits to Retirement Award recipients are merely "necessary consequences of the central injunctive relief they seek" and the relief they seek, reformation of the Retirement Awards, is equitable. Pls.' Opp'n at 28. Plaintiffs seek to compel Defendants, pursuant to Count I, to reform the terms of the Retirement Awards so that distribution of benefits under the Awards complies with ERISA's vesting requirements, and pursuant to Count II, to compel Defendants to "recalculate and distribute additional benefits due under the new ERISA-compliant terms." *Id.* at 30.

The federal courts diverge as to the proper characterization of claims alleging that because of an ERISA plan's use of illegal terms, the plan has improperly calculated and paid benefits to plan participants. For example, in *Fenwick v. Merrill Lynch & Co.*, the District Court for the District of Connecticut held that a claim challenging the legality of an ERISA plan's terms and seeking payment of additional benefits under ERISA-compliant terms was not a claim for equitable relief under Section 502(a)(3). 570 F. Supp. 2d 366, 374-75 (D. Conn. 2008). The *Fenwick* court stressed that "Section 502(a)(3) requires that both the basis for the claim and the nature of the recovery be equitable" and that claims are properly brought under ERISA Section 502(a)(3) only "if plaintiff seeks relief that was typically available in equity." *Id.* at 374 (internal

quotations and citations omitted). "Specific performance to pay on a contract or an injunction to compel the payment of money past due were not typically available in equity" and therefore plaintiffs failed to state a claim under Section 502(a)(3) where their claim, at its core, sought payment of money. *Id.* (internal quotations and citations omitted). The court therefore concluded that plaintiffs' claims primarily sought legal remedies, and were properly brought under Section 502(a)(1)(B), not Section 502(a)(3). *Id.*

The Sixth Circuit expressed a similar view in *West v. AK Steel Corp.*, 484 F. 3d 395 (6th Cir. 2007). In *AK Steel Corp.*, the Sixth Circuit noted that "[plaintiffs'] prayer for relief . . . centers on money damages for the alleged underpayment of a[n ERISA] benefit. Although the plaintiffs also request unspecified 'other relief as may be deemed just and equitable' . . . where the heart of the plaintiff's prayer for relief was a request for recovery of additional lump sum benefits" their claim sought a legal remedy, and was therefore not properly brought under Section 502(a)(3). *Id.* at 403-04.

Other courts express a contrary view. In *Carrabba v. Randalls Food Markets, Inc.*, 145 F. Supp. 2d 763 (N.D. Tex. 2000), plaintiffs alleged that a plan considered by the employer to be a "top hat plan"—a plan restricted to highly compensated employees as an additional benefit and not subject to ERISA's accrual and vesting requirements—was not in fact a top hat plan, and therefore, they were entitled to additional benefits that they would have received had the plan been properly categorized as a plan subject to ERISA's accrual and vesting requirements. *Id.* at 766. After a bench trial, the District Court for the Northern District of Texas agreed that the plan was not a top hat plan, and was therefore subject to ERISA's vesting and accrual requirements. *Id.* In determining to what relief plaintiffs were entitled, the court held that where plan participants alleged that the terms of their ERISA plan were illegal and sought payment of

additional benefits under revised terms that complied with ERISA, plaintiffs were entitled to seek relief under Section 502(a)(3) not Section 502(a)(1)(B). *Id.* at 770-71. The court reasoned that the plaintiffs were not seeking to recover "under the terms of" their plan, as provided for by Section 502(a)(1)(B), but were seeking reformation of the terms of their plan to comply with ERISA and payment of benefits under these revised terms.

Similarly, in *Laurezano v. Blue Cross & Blue Shield of Massachusetts, Inc. Retirement Income Trust*, 134 F. Supp. 2d 189 (D. Mass. 2001), the District Court for the District of Massachusetts held that because plaintiffs sought the payment of benefits under terms not contained in their plan, the claim would properly be brought under Section 502(a)(3), not Section 502(a)(1)(B). The court specifically held that the plaintiff, suing on behalf of a class, "probably cannot state a claim under ERISA § 502(a)(1)(B) because he does not seek a benefit due to him *under the terms of his plan.*" *Id.* at 194 (emphasis in original). The court noted that plaintiff sought benefits that included cost of living adjustments ("COLA payments"), which were not provided for under the terms of his ERISA plan. *Id.* "In this case, the parties do not seriously dispute that . . . the Plan specifically excludes COLA payments from any lump sum distributions . . . Rather than pervert the plain meaning of ERISA § 502(a)(1)(B), this Court will assume that [plaintiff] must find a cause of action elsewhere." *Id.* The appropriate provision of ERISA under which to bring his claims that he was entitled to COLA payments was Section 502(a)(3).

The Court finds the reasoning of the *Laurezano* and *Carrabba* courts more persuasive than the reasoning articulated in the *Fenwick* and *AK Steel Corp.* decisions. Under ERISA Section 502(a)(1)(B)'s plain language, that section only provides relief to a plaintiff who seeks "to recover benefits due to him *under the terms of his plan*, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" (emphasis

added). Therefore, Plaintiffs do not have any right, under the plain terms of Section 502(a)(1)(B), to seek recovery under vesting provisions *not* contained in their Retirement Awards. Further, reformation of the terms of a contract is a form of equitable relief. 66 Am. Jur. 2d Reformation of Instruments § 3. Therefore, to the extent that Plaintiffs seek to reform the Retirement Awards' vesting provisions to comply with ERISA's vesting requirements, they seek equitable relief. The heart of the allegations contained in Count I is that payment under the terms of the Retirement Awards' vesting provisions will violate ERISA, and reformation of the terms of the Awards is the only way to bring the Retirement Awards into compliance with ERISA. Count I therefore states a claim "to obtain other appropriate equitable relief" under 29 U.S.C. § 1132(a)(3).

Defendants also argue that the Supreme Court's decision in *Varity Corp. v. Howe*, as interpreted by the Fourth Circuit in *Korotynska v. Metropolitan Life Ins. Co.*, precludes Plaintiffs from simultaneously pursuing claims under ERISA Sections 502(a)(1)(B) and 502(a)(3). In *Varity Corp. v. Howe*, the Supreme Court held that ERISA Section 502(a)(3) creates a "catchall" which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). The plaintiffs in *Varity*, relying on their employer's representations, agreed to transfer from that employer to another company and the new company's ERISA benefit plan. *Id.* at 494. When the company to which they transferred later failed, they sued the corporate parent and a subsidiary of their former employer to recover benefits under their *old* ERISA plan. The Supreme Court held that the *Varity* plaintiffs, who could not sue under § 1132(a)(1), because they were no longer members of the plan from which they sought benefits (and who also could not sue under § 1132(a)(2), because that provision did not provide a remedy for individual

beneficiaries), could sue under § 1132(a)(3) because they had no "adequate relief" under other provisions of ERISA. *Id.* at 515.

The *Varity* Court held:

> [T]he [ERISA] statute authorizes '*appropriate*' equitable relief. We should expect that courts, in fashioning 'appropriate' equitable relief, will keep in mind the 'special nature' and purpose of employee benefit plans,' and will respect the 'policy choices reflected in the inclusion of certain remedies and the exclusion of others.' Thus we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'"

*Id.* at 515 (emphasis in original).

In *Korotynska v. Metropolitan Life Ins. Co.*, the Fourth Circuit held that the plaintiff could not bring a claim for equitable relief under Section 1132(a)(3) because her injury could adequately be redressed under Section 1132(a)(1)(B). 474 F. 3d 101, 106 (4th Cir. 2006). The Fourth Circuit found that, though the plaintiff couched her claim as one alleging a breach of fiduciary duty, what she actually sought was the payment of ERISA benefits which she claimed had been improperly denied her. *Id.* The Fourth Circuit held that claims for payment of individual benefits were more properly brought under Section 1132(a)(1)(B), and plaintiff's claim under Section 1132(a)(3) was improper because it was a mere "repackaging" of a denial of benefits claim. *Id.* at 106. The Fourth Circuit noted that "[a]lthough the Second Circuit has held that plaintiffs may seek relief simultaneously under § 1132(a)(1)(B) and § 1132(a)(3), the great majority of circuit courts have interpreted *Varity* to hold that a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)." *Id.*

Defendants argue that *Korotynska* stands for the principle that plaintiffs may not simultaneously seek relief under Sections 502(a)(3) and 502(a)(1)(B). *Id.* at 24. Plaintiffs

counter that they cannot obtain complete relief just by bringing a claim under Section 1132(a)(1)(B), because they do not seek only payment of benefits under the terms of their Retirement Awards, but also seek reformation of those awards to comply with ERISA's vesting requirements.  Plaintiffs point out that they "seek to enforce the terms of ERISA *and to make the Retirement Awards comply with ERISA's substantive provisions*—relief that is only available under § 502(a)(3)."  Pls.' Opp'n at 29 (emphasis added).  Section 502(a)(1)(B) only allows a plaintiff to sue "under the terms of his plan" and to enforce his rights "under the terms of his plan."  Pls.' Opp'n at 29 (citing ERISA Section 502(a)(1)(B)'s language).

Defendants read *Korotynska* too broadly.  The fairest reading of *Korotynska*'s holding is that where a plaintiff can obtain complete relief under Section 502(a)(1)(B), for example, where he seeks only the payment of benefits under the terms of his ERISA plan, he cannot simultaneously bring a claim under Section 502(a)(3).  The *Korotynska* court did not hold that bringing simultaneous claims for relief under Sections 502(a)(3) and 502(a)(1)(B) is *always* inappropriate.  The *Korotynska* court highlighted the fact that "[t]here is [] no question that Korotynska's injury is redressable elsewhere in ERISA's scheme" and explicitly stated, "our holding preserves the true purpose of § 1132(a)(3): to authorize individual equitable relief, not where plan administrators have made a mistake on an individual benefits determination, but where, as in *Varity*, ERISA's other provisions do not afford *adequate* relief."  *Korotynska*, 474 F. 3d at 108 (emphasis added).  Though *Korotynska* cited positively other circuits' interpretations of *Varity* as precluding a plaintiff from simultaneously seeking relief under Sections 502(a)(3) and 502(a)(1)(B), the actual holding of *Korotynska* is that where "§ 1132(a)(1)(B) affords plaintiff *adequate* relief for her benefits claim, . . . a cause of action under § 1132 (a)(3) is [] not appropriate."  *Id.* at 107 (emphasis added).

*Korotynska* clearly involved a plaintiff's attempt to "repackage" a Section 502(a)(1)(B) claim for denial of benefits into a claim for injunctive relief under Section 502(a)(3). Where plaintiffs are not merely repackaging a benefits claims, "it is entirely appropriate to bring simultaneous § 502(a)(3) and § 502(a)(1)(B) claims to address 'two separate and distinct injuries' that are based in whole or in part on different facts." *See, e.g., Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F. 3d 833, 839-40) (6th Cir. 2007) (plaintiff could simultaneously bring claims under ERISA Sections 502(a)(3) and 502(a)(1)(B) where plaintiff's breach of fiduciary duty claims under Section 502(a)(3) were not a "repackaging" of his claim that he was improperly denied ERISA benefits).

Plaintiffs' claims under § 502(a)(3) are based on Defendants' failure to bring the Retirement Awards into compliance with ERISA's vesting requirements. By contrast, Plaintiffs' § 502(a)(1)(B) claims are based on Defendants' refusal to pay benefits to recipients of the Retirement Awards upon request (as in England's case) or proactively when the recipients reached the age of 65 (as in the case of the other named Plaintiffs), consistent with the terms of those awards. In other words, Count I alleges that (1) the Retirement Awards program is subject to ERISA and the terms of the Retirement Awards violate ERISA, whereas (2) Count II alleges that Marriott is failing to accurately account for market transactions and failing to proactively distribute benefits to eligible plan participants as required under the terms of their Retirement Awards. These two claims appear to be based, at least in part, on different facts, and therefore Plaintiffs § 502(a)(3) claim is not a mere "repackaging" of their § 502(a)(1)(B) claim, as in *Korotynska*.

Plaintiffs here clearly seek reformation of their Retirement Awards to comply with the terms of ERISA *and* the payment of benefits under those reformed awards. *See* Pls.' Opp'n at

30. Plaintiffs cannot receive complete and adequate relief under Section 502(a)(1)(B) alone, because that Section only allows a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Nor can they receive complete relief under Section 502(a)(3), which does not allow for payment of damages. Plaintiffs are entitled to first pursue a claim under Section 502(a)(3) for reformation of the terms of the Retirement Awards, and then to pursue a claim under Section 502(a)(1)(B) for recalculation and distribution of benefits due under the ERISA-complaint terms of the revised awards.

Accordingly, the Court rejects Defendants' argument that Count I fails to state a claim for equitable relief and that Plaintiffs may not simultaneously bring claims under ERISA Sections 502(a)(3) and 502(a)(1)(B).[3]

## IV. Failure of Count I to State a Claim for Employees Who Terminated Employment Before ERISA's enactment

Defendants argue that ERISA's vesting provisions, which became effective on January 1, 1976, do not apply to any member of the putative class—including Mr. England—who terminated employment with Marriott's corporate predecessors prior to that date. Defs.' Mot. to Dismiss at 25. ECF No. 42-1. Defendants cite to *Cohen v. Martin's*, 694 F. 2d 296 (2d Cir. 1982) in support.

In *Cohen*, the Second Circuit held that ERISA's vesting requirements, outlined in 29 U.S.C. § 1053(a), which became effective January 1, 1976, did not apply retroactively to persons who terminated their employment before the requirements became effective. 694 F. 2d at 300.

---

[3] Defendants also argue that Plaintiffs do not seek "appropriate" equitable relief because Plaintiffs seek to enforce ERISA's vesting requirements while ignoring ERISA's corresponding trust and funding requirements. Defs.' Mot. to Dismiss at 22. Therefore, Plaintiffs are "ignor[ing] those [ERISA provisions] that would work to their financial detriment" while suing to enforce those that work to their financial benefit, according to Defendants. *Id.* This argument is premature: to the extent that the Court finds that the Retirement Awards are subject to ERISA, it can order relief that complies with all provisions of ERISA, not just ERISA's vesting requirements.

The *Cohen* court noted that ERISA's vesting provisions spoke "of 'an employee's right' to receive pension benefits" and noted that an "employee" is defined under ERISA as "any individual *employed* by an employer." *Id.* at 298 (emphasis added). The court noted that other sections of ERISA referred to plan "participants," which ERISA defines as "any employee *or former employee* of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." *Id.* (emphasis added). The court concluded that "[h]ad Congress intended to extend the protections of the vesting requirement to retirees such as [plaintiff], it would have spoken of a 'participant's right' to receive benefits" rather than an "employee's right" to receive benefits under the mandatory vesting provisions. *Id.* Use of the term "employee" in the vesting requirements section of ERISA demonstrates Congress' intent to apply the mandatory vesting requirements only to employees actually employed on January 1, 1976. This interpretation has been consistently followed by other federal courts, and this Court thinks it is the correct interpretation of the statute. *See Fremont v. McGraw-Edison Co.*, 606 F.2d 752, 755 (7th Cir. 1979), *Bruchac v. Universal Cab Co.*, 580 F. Supp. 295, 302 (N.D. Ohio 1984), *Stewart v. Nat'l Shopmen Pension Fund*, 563 F. Supp. 773, 777 (D.D.C. 1983).

According to the Amended Complaint, Plaintiff England was employed by Defendants' predecessor companies from "at least 1966 to January 9, 1970." Am. Compl. ¶ 50. Plaintiff England was not an employee of Marriott or its corporate predecessors at the time ERISA's mandatory vesting requirements went into effect and thus cannot state a claim alleging he is entitled to enforce ERISA's minimum vesting requirements. Defendants similarly argue that members of the putative class who ceased employment prior to January 1, 1976, have no claim that their Retirement Awards fail to comply with ERISA's vesting requirements. The Court agrees. Both the reasoning of *Cohen* and the broad consensus of the federal courts in

interpreting 29 U.S.C. § 1053(a) as applying only to employees employed on January 1, 1976 supports the conclusion that Count I fails to state a claim with respect to employees, like Plaintiff England, who terminated employment with Marriott's predecessor companies before ERISA's effective date.

The Court concludes that Count I fails to state a claim that the Retirement Awards fail to comply with ERISA's minimum vesting requirements with respect to employees who ceased employment with Defendants' predecessor companies prior to January 1, 1976.

**V.   Breach of Contract Claim**

Defendants argue that Count III is preempted to the extent that Count II seeks claims for benefits under ERISA Section 502(a)(1)(B).  Defendants acknowledge that Count III is explicitly pled in the alternative to the ERISA claims raised in Counts I and II.  *See* Defs.' Mot. to Dismiss at 35 n. 15.   While it is clear that, for those to whom ERISA applies, contract claims are preempted, *Metro. Life Ins. Co. v. Dedeaux*, 481 U.S. 541, 545-55 (1987), it would be premature to dismiss the breach of contract claims at this point.  The central dispute in this case is *whether* ERISA applies to the Retirement Awards.  Only if and when the Court decides that ERISA does apply to the Retirement Awards would dismissal of the breach of contract claims (Count III) be appropriate.   Further, as to Plaintiff England, who is not covered by ERISA's vesting requirements, a breach of contract claim may be his only viable claim.

<u>**CONCLUSION**</u>

Accordingly, the Court shall, by separate order, grant Defendants' motion to dismiss

Count I as to Plaintiff England and deny Defendants' motion in all other respects.


<u>February 14, 2011</u>          <u>           /s/           </u>
Date                          Roger W. Titus
                                United States District Judge