IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DENNIS WALTER BOND, SR.,** *et al.*, | * |
| Plaintiffs, | * |
| v. | * Case No. 10-cv-1256-RWT |
| **MARRIOTT INTERNATIONAL, INC.,** *et al.*, | * |
| Defendants. | * |

## MEMORANDUM OPINION

On January 19, 2010, the Plaintiffs, former employees of Marriott International, Inc. ("Marriott") and/or its corporate predecessors, filed a Class Action Complaint against Marriott and Marriott International, Inc. Stock and Cash Incentive Plan in the United States District Court for the District of Columbia. ECF No. 1. The Plaintiffs, who received Retired Deferred Stock Bonus Awards ("Retirement Awards"), claimed that Marriott was failing to issue stock to Retirement Award recipients, or issuing less stock than what is due under the Retirement Awards and the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* at 2. The Plaintiffs sought to recover damages for the Defendants' failure to comply with the Retirement Awards and ERISA, and to clarify their rights under ERISA. *Id.*

On May 17, 2010, Judge Emmet G. Sullivan granted the Defendants' unopposed motion to transfer venue, and ordered that the case be transferred to this Court. ECF No. 26. After the Plaintiffs filed their First Amended Complaint in this Court, ECF No. 39, the Defendants filed a Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 42. On February 14, 2011, this Court issued a Memorandum Opinion, ECF No. 51, and Order, ECF No. 52, granting in part

and denying in part the Defendant's Motion to Dismiss, dismissing Count I of the Plaintiffs' First Amended Complaint as to one Plaintiff.

On October 17, 2011, the Plaintiffs filed a Second Amended Complaint. ECF No. 69. On September 10, 2012, the Plaintiffs filed a Motion for Class Certification, ECF No. 80, proposing two classes: (1) The "Top-Hat" Class; and (2) The Limitations Class. Marriott filed a Motion for Summary Judgment on December 19, 2012, ECF No. 97, arguing that the Plaintiffs' ERISA claims are barred by the statute of limitations and the doctrine of laches. On January 23, 2013, the Plaintiffs filed their Cross-Motion for Summary Judgment on the statute of limitations and laches issues. ECF No. 100.

## FACTS

**I. Marriott Implements a Retirement Award Program in 1963**

Between 1963 and 1990, Marriott (formerly known as Hot Shoppes, Inc.) provided deferred stock bonus awards ("Retirement Awards") to management employees. Defs.' Summ J., Exs. 1-4, ECF No. 98. Marriott provided award certificates to each recipient, which included terms of the Retirement Awards, such as the number of shares granted, grant date, vesting provisions, share distribution schedule, anti-dilution protections, forfeiture conditions, noncompetition covenants, and recordkeeping obligations. *Id.* Exs. 6-8. The certificates noted that the recipient would receive a specified number of shares at a later date subject to vesting requirements; specifically, they stated that the shares would vest in pro-rata annual installments from the grant date until a recipient reached age 65. *Id.* Awards also vested upon a recipient's death, disability, or approved early retirement. *Id.*

Vested shares were generally paid in ten annual installments beginning upon retirement, disability, or age 65. *Id.* Retirement Awards were designed to be "tax sheltered" so that

recipients did not have to pay taxes on them until stocks were actually distributed to them. *Id.* Ex. 16, 1978 Prospectus. When Marriott first distributed Retirement Awards in 1963, only sixteen managers received them. *Id.* Ex. 24, Marriott Annual Reports. By the mid-1970s, however, Marriott had expanded its distribution of Retirement Awards to include any "key employee," and issued them to nearly a thousand employees per year with varying job titles and salaries. Deposition of Tracy Anne Ballow as Marriott's Rule 30(b)(6) designee, at 20:18–21:4 ("Ballow Dep."); Declaration of Michael E. Klenov in Support of Plaintiffs' Motion for Class Certification ¶ 10 ("Klenov Decl.").

## II. Congress Enacts ERISA in 1974

In 1974, Congress enacted ERISA and imposed participant protective requirements on pension plans, including funding, vesting, and fiduciary requirements. 29 U.S.C. §§ 1051-1061; §§ 1061-1086; §§ 1104-1114. Because the Retirement Awards program was designed to provide retirement income to Marriott employees, it became an ERISA-governed "pension plan" upon ERISA's January 1, 1976 effective date. Congress included exemptions from ERISA's substantive obligations for certain types of pension plans, including the "top-hat" plan. A top-hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Id.* §§ 1051(2), 1081(a)(3), 1103(a)(1). Top-hat plans are still ERISA "pension plans," but they are exempt from ERISA's participation, funding, vesting, and fiduciary requirements. *Id.*

In 1978, after ERISA's passage, Marriott determined that ERISA's vesting requirements were inapplicable to Retirement Awards because the awards fell within the top-hat exemption. That same year, Marriott issued a Prospectus to Retirement Award recipients. Defs.' Summ. J.,

3

Ex. 16, 1978 Prospectus. A prospectus is a document that publicly-traded companies were required to distribute to shareholders when they sponsored stock-based employee benefit plans, to inform shareholders of the creation of additional shares that could dilute their ownership and voting rights in the company. Ballow Dep. at 85:16–86:8. Marriott's 1978 Prospectus included a paragraph commenting on the ERISA status of its employee benefit plan, as follows:

ERISA:

> The Incentive Plan is an "employee pension benefit plan" within the meaning of [ERISA]. However, inasmuch as the Plan is unfunded and is maintained by the Company primarily for the purpose of providing deferred compensation for a selected group of management or highly compensated employees, it is deemed a "select plan" and thus is exempt from the participation and vesting, funding and fiduciary responsibility provisions of Parts 2, 3, and 4 respectively of Subtitle B of Title 1 of the Act. The reporting and disclosure provisions of Part 1 of Subtitle B of the Act continue to apply and under Section 2520.104-23 of the regulations, the Company has filed a statement with the Department of Labor providing certain information with respect to the Incentive Plan. The Company will not extend to participants any of the protective provision of the Act for which an exemption may properly be claimed.

Defs.' Summ. J., Ex. 16, 1978 Prospectus at p. 6. Similar disclaimers regarding ERISA were included in later prospectuses in 1980, 1986, 1991, 1993, 1996, and 1998. *Id.* Exs.17-22.

By the mid-1980s, several thousand Marriott employees were receiving Retirement Awards annually. In May of 1990, the United States Department of Labor ("DOL") issued an advisory opinion concerning the top-hat exemption. Dep't of Labor, Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933 (May 8, 1990). In this opinion, DOL provided that the top-hat exemption was designed for top-level executives capable of negotiating their own deferred compensation packages and who did not need ERISA's substantive protections, and provided that a plan which extends coverage "beyond 'a select group of management or highly compensated employees' would not constitute a 'top hat' plan." *Id.* at n.1

Shortly after DOL's 1990 advisory opinion, Marriott amended its pension schemes to conform to DOL's interpretation of the top-hat exemption, and entirely discontinued Retirement Awards. Ballow Dep. at 111:9–112:11. Marriott replaced Retirement Awards with another form of stock award that deferred payment until the recipient's termination from Marriott. Pl.'s Class Cert. Br., Ex. 2, p. 25 (MI-1_00021). Marriott restricted eligibility for the award to associates with a pay grade of 56 and above. *Id.* As a result of this restriction, the number of Marriott employees receiving ERISA-governed deferred stock awards dropped from roughly 2,500 in 1989, to less than 100 in 1990. Klenov Decl. ¶ 16.

Marriott informed participants of the amendments to its pension plan in a November 1990 Memo. Pl.'s Class Cert Br., Ex. 8 (1990 Memo to Plan participants announcing changes to the Plan). The Memo informed participants that "[r]equirements under [ERISA] have prompted recent changes to the way in which Marriott associates may request their award payments." *Id.* at 2. The Memo then announced the eligibility changes, as well other changes in how awards were calculated, distributed, and subject to noncompetition provisions. Ballow Dep. at 117:21–120:15. Because the amendments to the Marriott Plan had to be approved by a vote of shareholders, Marriott announced the proposed amendments in a 1991 Proxy Statement sent to all shareholders (including participants). Pl.'s Class Cert Br., Ex. 9 (1991 Proxy Statement).

### III. Plaintiffs Received Retirement Awards As Former Marriott Employees

Plaintiffs Dennis Walter Bond, Sr., and Michael P. Steigman, former Marriott employees, bring this action on behalf of all Retirement Award recipients to force Marriott to reform the vesting terms of the Retirement Awards to comply with ERISA, and to collect the additional benefits recipients are entitled to under ERISA-compliant vesting schedules. Second Am. Compl. ¶ 5, ECF No. 69.

5

Bond worked at Marriott for 18 years from 1973 until 1991. Defs.' Summ. J., Ex. 28, Bond Interrog. Resp. No. 1; Ex. 29, Bond Dep., at 50:2-51:12. He began as an assistant sales manager and left as a general manager. Bond. Dep., at 51:18-19; 165:7-12. During his employment, he received Retirement Awards in 1976, 1977, 1978, 1979, 1988, and 1989. *Id.* at 82:1-13; 95:13-15; 97:20-98:3; 154:4-16; 157:3-6. In 2006, more than three years before this case was filed, Bond was paid all of his vested shares based upon the vesting schedule provided in the awards. *Id.* at 203:5-12; 205:2-17. His deferred stock bonus awards vested annually over a period of years determined by subtracting his then-current age from 65, and he forfeited the unvested portion of those awards if he left Marriott before age 65. *Id.* at 90:18-91:7; 167:18-168:14. When Bond left Marriott in 1991, he was two years away from being fully-vested in his awards because he would have had 20 years of service. *Id.* at 90:18-91:7; 167:18-168:14.

Steigman worked at Marriott for 17 years from 1973 until he was asked to resign in 1990. Defs.' Summ. J., Ex. 32, Steigman Resp. to Interrogs. No. 1; Ex. 33, Steigman Dep., at 22:13-15; 161:19-162:1; 170:12-17. He began as an assistant restaurant manager and left as a general manager. *Id.* Ex. 32, Steigman Resp. to Interrogs. No. 1; Ex. 33, Steigman Dep., at 24:16-19. Steigman received deferred stock bonus awards in 1974 and 1975. *Id.* at 34:13-35:9; 40:14-16. When Steigman left Marriott in 1990, he signed a release of all claims against Marriott. *Id.* Ex. 34, Steigman Release. The release provided that he "acknowledges that he has reviewed this agreement with an attorney of his choice and he understands all the terms of this agreement and voluntarily enters into this agreement for the reasons stated in the Agreement." *Id.* ¶ 18.

Shortly after his termination from employment with Marriott in 1991, and 20 years before he joined this case as a named Plaintiff, Marriott paid Steigman all of the vested shares due under the terms of his deferred stock bonus award. *Id.* Ex. 33, Steigman Dep., at 183:3-184:15.

Marriott last granted deferred stock bonuses in 1990, and the majority of bonus stock award recipients, like Bond and Steigman, were paid out before this case was filed. *Id.* Ex. 5, Vance Aff. At the time this case was filed, 502 of the more than 8,000 bonus award recipients had not been fully paid their vested bonus award shares. *Id.*

## PROCEDURAL HISTORY

On June 6, 2009, former Plaintiff Robert England filed a complaint against Marriott in the Circuit Court of Montgomery County, Maryland. England's state court complaint included state-law causes of action for breach of contract, detrimental reliance, and unjust enrichment relating to his Retirement Awards. On September 9, 2009, England filed a first amended complaint in Montgomery County Circuit Court on behalf of himself and all others similarly situated against Marriott, Host Hotels & Resorts, Inc., and Host Hotels & Resorts, L.P.

On January 19, 2010, England moved to dismiss his state court action and filed the original Complaint in this case in the United States District Court for the District of Columbia, adding Bond, Lewis F. Foster, and Douglas W. Craig as Plaintiffs, and including ERISA-based claims. ECF No. 1. The case was then transferred to this Court, and on July 21, 2010, former Plaintiffs England, Foster, and Craig, and current Plaintiff Bond filed a First Amended Complaint with allegations similar to those in the original Complaint. ECF No. 39.

On August 20, 2010, the Defendants moved to dismiss the First Amended Complaint on statute of limitations and other grounds. ECF No. 42. Following oral argument on December 20, 2010, the Court issued a Memorandum Opinion granting in part and denying in part Defendants' Motion to Dismiss. *England v. Marriott Int'l, Inc.*, 764 F. Supp. 2d 761 (D. Md. 2011). The Court granted Defendants' Motion to Dismiss the ERISA claims brought on behalf

of England because he terminated employment prior to ERISA's effective date, but otherwise denied Defendants' Motion to Dismiss.

Thereafter, the Defendants answered Plaintiffs' First Amended Complaint. ECF No. 59. The parties engaged in pre-discovery mediation discussions, but were unable to reach a settlement. ECF No. 62. On October 13, 2011, the parties filed a Stipulation of Dismissal, voluntarily dismissing Plaintiffs Foster and Craig. ECF No. 67. On October 17, 2011, Plaintiffs Bond and England, joined by new Plaintiff Steigman, filed a Second Amended Complaint. ECF No. 69. The parties then engaged in discovery limited to class certification and statute of limitations issues. ECF Nos. 70, 74, 87. After the close of limited discovery, the parties agreed to Plaintiff England's voluntary dismissal. ECF No. 83.

On September 10, 2012, the Plaintiffs filed their Motion for Class Certification. ECF No. 80. On October 16, 2012, the Defendants filed an Opposition to Plaintiffs' Motion for Class Certification. ECF No. 89. On November 13, 2012, the Plaintiffs filed a Reply Brief in Support of Class Certification. ECF No. 93.

On December 19, 2012, the Defendants filed a Motion for Summary Judgment as to the remaining Counts I and II of the Second Amended Complaint. ECF No. 97. On January 23, 2013, the Plaintiffs filed a Cross-Motion for Summary Judgment on statute of limitations and laches. ECF No. 100. On February 21, 2013, the Defendants filed a Reply in support of their Motion for Summary Judgment and an Opposition to Plaintiffs' Cross-Motion for Summary Judgment. ECF No. 107. On March 13, 2013, the Plaintiffs filed a Reply in Opposition to Marriott's Motion for Summary Judgment and in support of their Cross-Motion. ECF No. 109.

On June 7, 2013, the Court held a hearing on the parties' cross-motions for summary judgment and the Plaintiffs' Motion for Class Certification. The Defendants filed a

Supplemental Memorandum in Support of Motion for Summary Judgment, ECF No. 117, on June 26, 2013, and the Plaintiffs filed a Response on June 30, 2013. ECF No. 118.

## STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each motion the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.*[1]

---

[1] For ease of reference, the standard of review for class certification is included in the analysis of that issue below.

9

## ANALYSIS

I.  **Statute of Limitations**

In Count I of their Second Amended Complaint, the Plaintiffs seek injunctive and other equitable relief under ERISA. *See* 29 U.S.C. § 1132(a)(3) (providing that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan"). They assert that the terms of "the Retirement Awards issued to Plaintiffs . . . provide that awards of stock will vest pro-rata, on an annual basis, until the recipient turns 65. These terms result in wildly varying vesting schedules for recipients of Retirement Awards based on their age at the time of the award. The vesting terms of the Retirement Awards violate the minimum vesting requirements of 29 U.S.C. § 1053(a)." Second Am. Compl. ¶ 87, ECF No. 69.

In Count II of their Second Amended Complaint, the Plaintiffs seek declaratory relief and benefits under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). The Plaintiffs allege that putative "class members who have received benefits from Defendants or their predecessors based on the application of vesting terms that violate the ERISA are entitled to recover benefits due to them under ERISA-compliant vesting terms. Those class members who have not yet received their distributions are entitled to a declaration that their future benefits should be calculated using ERISA-compliant vesting

terms." Second Am. Compl. ¶ 92, ECF No. 69. Counts I and II concern the classification of Marriott's pension plans under ERISA.

Put simply, the Plaintiffs ask the Court for the following relief: (1) to declare that the plan is subject to ERISA's substantive requirements; (2) to enjoin Marriott from continuing to administer the plan in violation of ERISA; (3) to order Marriott to reform the plan to comply with ERISA's substantive requirements; and (4) to order Marriott to recalculate and distribute additional benefits under the reformed, ERISA-compliant plan terms. The Defendants argue in their Motion for Summary Judgment that this "is an archetype of a case where the statute of limitations should bar a claim relating to these deferred stock bonus awards that were granted between 1963 and 1990." Defs.' Summ. J. 34, ECF No, 98.

The parties agree that ERISA does not contain an explicit statute of limitations for the Plaintiffs' claims. *See White v. Sun Life Assur. of Canada*, 488 F.3d 240, 245 (4th Cir. 2007) ("Like many federal laws, the cause of action for benefits due under an ERISA plan does not contain a statute of limitations, nor does it specify when the statute begins to run."). As this Court previously observed in rejecting the Defendants' statute of limitations argument at the motion to dismiss stage, "[w]here ERISA provides no explicit statute of limitations for a given cause of action, the court must refer to the forum state's laws and apply the most analogous statute of limitations." *England v. Marriott Internat'l, Inc.*, 764 F. Supp. 2d 761, 770 (D. Md. 2011) (citing *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir. 1992)). The Court concluded—and the parties continue to assert here—that the "most analogous state of limitations is Maryland's statute of limitation[s] for breach of contract actions, which provides for a three-year statute of limitations." *Id.*

Application of the statute of limitations requires analysis of the date of accrual of the cause of action. "The clock generally begins to run at the time a plaintiff can first file suit." *White*, 488 F.3d at 245. In the Fourth Circuit, "[a]n ERISA cause of action does not accrue until a claim of benefits has been made and formally denied." *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir. 1989); *see Williams v. Ironworkers Local 16 Pension Fund*, 178 Fed. App'x 235, 237 (4th Cir. 2006) ("[O]ur cases key the accrual of an ERISA cause of action and, thus, the statute of limitations, to the fact of claim and formal denial.") "This means that the statute of limitations begins to run at the moment when the plaintiff may seek judicial review, because ERISA plaintiffs must generally exhaust administrative remedies before seeking judicial relief." *White*, 488 F.3d at 245. This "accrual rule . . . is plain and unconditional." *Id.*

The Defendants rest their argument that the Plaintiffs' claims are time-barred primarily on the prejudice Marriott would endure were it required to demonstrate that the top-hat exception actually applied to Retirement Awards. They argue "that existing case law indicates that whether Marriott can prove that the top-hat exception applied to their deferred stock bonus awards decades after they were granted may require Marriott to conduct a detailed, time-consuming, expensive analysis of a number of very old facts, including an analysis of the positions, duties and responsibilities of thousands of former employees each year since 1963." Defs.' Summ. J. 26, ECF No. 98. Citing authority from outside of the Fourth Circuit, they argue that that the statute of limitations "begins to run earlier when there is a 'clear repudiation' of the benefits that are at issue." *Id.* at 29. The Defendants argue that the Plaintiffs "were told way back in 1978 [in the 1978 Prospectus] that the awards were subject to ERISA but they would not get ERISA vesting," and this constituted a "clear repudiation of any claim to ERISA vesting." *Id.* at 32. In addition, they claim that the Plaintiffs received an additional "clear repudiation"

12

when Marriott provided them with annual statements detailing their vested and unvested shares. *Id.* at 37. Finally, they assert that the Plaintiffs actually received payment of the shares that vested under the terms of their awards, and a payment of benefits is also a repudiation of benefits beyond those paid. *Id.* at 38.

The Court declines the Defendants' invitation to venture beyond the Fourth Circuit's "plain and unconditional" rule that ERISA claims accrue upon formal denial of a claim. *White*, 488 F. 3d at 245.[2] ERISA's written plan and participant notification requirements serve the "the values of notice and certainty." *Id.* at 249. The facts of this case illustrate the consequences for benefit plan recipients who do not enjoy meaningful notice and certainty regarding the applicability of ERISA to their employer's retirement plan. Marriott did not adopt an administrative claims procedure until after the Plaintiffs filed this lawsuit, and so it was impossible for the Plaintiffs to participate in any internal benefit claims determination, receive a

---

[2] The parties briefly discuss the Fourth Circuit's opinion in *Cotter v. Eastern Conference of Teamsters Retirement Plan*, 898 F.2d 424 (4th Cir. 1990). That opinion dealt with circumstances where "specification of the date at which [the plaintiff's] claim for benefits 'was denied' [was] somewhat elusive." *Id.* at 429. The record was unclear as to whether a claim the plaintiff filed upon his departure from employment "was such that the amount of the benefit check that [the plaintiff] subsequently received effectively constituted denial of a claim for the benefits at issue in this case." *Id.* Still, the court "remain[ed] consistent" with the formal denial rule, and determined that an event other than denial—specifically, the plaintiff's presence at a deposition where an official made statements indicating that he "had been entitled to benefits while he was working at" the employer constituted an "event other than a denial of a claim" which "alerted [the plaintiff] to his entitlement to the benefits he did not receive during his employment." *Id.* The case was still filed within the applicable statute of limitations, even using the deposition date as the date of accrual of his claim. *Id.* Here, we have no deposition or similar event where the Plaintiffs were clearly put on notice of their claims, and so *Cotter* does not support the Defendant's argument that formal denial should not be the standard in this case.

13

formal denial therefrom, and accrue a cause of action. *England v. Marriott Internat'l, Inc.*, 764 F. Supp. 2d 761, 767 (D. Md. 2011).[3]

In addition, the Retirement Awards, annual statements, and 1978 Prospectus never adequately informed the Plaintiffs that they had been harmed, or that they could seek relief under ERISA. Rather, the virtually indecipherable legalese in the statement concerning ERISA's applicability is murky at best; the 1978 Prospectus states in conclusory fashion that the plan "is an 'employee pension benefit plan' within the meaning of [ERISA]. However, inasmuch as the Plan is unfunded and is maintained by the Company primarily for the purpose of providing deferred compensation for a selected group of management or highly compensated employees, it is deemed a 'select plan' and thus is exempt from the participation and vesting, funding and fiduciary responsibility provisions . . . of the Act. The reporting and disclosure provisions . . . of the Act continue to apply and . . . the Company has filed a statement with the Department of Labor providing certain information with respect to the Incentive Plan. The Company will not extend to participants any of the protective provisions of the Act for which an exemption may properly be claimed." Defs.' Summ. J., Ex. 16, 1978 Prospectus at p. 6. Marriott's statement that it was complying with ERISA was made to award recipients who had no legal expertise in the multifarious world of ERISA law. Such an obtuse communication cannot reasonably be defined as a "clear repudiation" of any sort. *See* Merriam-Webster, Definition of "Repudiate"

---

[3] This Court's earlier opinion relied in part on *Fenwich v. Merrill Lynch & Co., Inc.*, 570 F. Supp. 2d 366, 373 (D. Conn. 2008) (observing that a "plaintiff has 'actual knowledge' of the breach or violation [of ERISA] when that plaintiff has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached a duty or otherwise violated ERISA," and finding that the plaintiffs did not have "actual knowledge" where they "had not received information regarding all of the Plan terms and the Plan participation so as to afford plaintiffs actual knowledge that a breach of fiduciary duty had occurred").

("to reject as unauthorized"; "to refuse to acknowledge or pay"), *available at* http://www.merriam-webster.com/dictionary/repudiated?show=0&t=1370301197.

Plaintiff Bond testified that he did not know what ERISA was while he worked for Marriott, and that he has no idea what qualifies as an exempt top-hat plan. Bond Dep. at 40:9–41:4; 102:4–104:1. Plaintiff Steigman testified that he did not understand ERISA, how it applied to the Marriott pension scheme, what the top-hat exemption consisted of, or how his Retirement Award benefits might have been affected by the application of ERISA's substantive requirements. Steigman Dep. at 76:11–81:10, 202:15–203:8, 203:18–19, 208:1–209:19. The Plaintiffs did not know that they were entitled to ERISA's substantive protections, including its minimum vesting requirements, until they became involved in this lawsuit. Bond Dep. at 208:1–209:19, 242:17–243:6; Steigman Dep. at 202:15–203:8, 208:1–209:19. The Fourth Circuit's accrual rule for ERISA claims makes practical sense here, because to "hold otherwise would require lay participants and beneficiaries to be constantly alert for 'errors or abuses that might give rise to a claim and start the statute of limitations running,'" and "also would burden the judicial system with multiple and premature actions." *Rodriguez*, 872 F.2d at 72 (quoting *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1501 (9th Cir. 1984)).

The Fourth Circuit's accrual rule is also founded on ERISA's substantive and procedural requirements. *See White*, 488 F.3d at 246. "Internal appeals are one cornerstone of ERISA," and "judicial review is another: When internal review mechanisms do not resolve a dispute over benefits, a plan participant may challenge the plan's decision in court." *Id.* at 247 (citing 29 U.S.C. § 1132(a)). "This interlocking remedial structure does not permit an ERISA plan to start the clock ticking on civil claims while the plan is still considering internal appeals." *Id.* "Indeed, a plan that did not reach a final decision until after the statute of limitations had run

would deprive a participant of the right to file a civil claim at all. These incentives to delay would undermine internal appeals processes as mechanisms for 'full and fair review,' *see* 29 U.S.C. § 1133(2), and undermine the civil right of action as a complement to internal review." *Id.* at 248. Applying the Fourth Circuit's formal denial rule in analyzing Marriott's argument that the Plaintiffs' ERISA claims are barred by the statute of limitations, the Court denies Marriott's Motion for Summary Judgment [ECF No. 97] on statute of limitations, and grants Plaintiffs' Cross-Motion for Summary Judgment [ECF No. 100] on this issue.

## II. Doctrine of Laches

The Defendants also argue that the Plaintiffs claims' are barred by the doctrine of laches, because the "Plaintiffs waited decades to bring their equitable claims for ERISA vesting despite the fact that they knew all of the relevant facts decades ago." Defs.' Summ. J. 45, ECF No. 98. "The doctrine of laches is based on the maxim that equity aids the vigilant, not those who sleep on their rights." *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001). "Laches may be applied by a court to bar a suit in equity that has been brought so long after the cause of action accrued that the court finds that bringing the action is unreasonable and unjust." *Id.* at 798. "Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).

"[W]hen considering the timeliness of a cause of action brought pursuant to a statute for which Congress has provided a limitations period, a court should not apply laches to overrule the legislature's judgment as to the appropriate time limit to apply for actions brought under the statute. Separation of powers principles . . . preclude [the Court] from applying the judicially

16

created doctrine of laches to bar a federal statutory claim that has been timely filed under an express statute of limitations." *Id.*

In *Dameron v. Sinai Hospital of Baltimore, Inc.*, 815 F.2d 975, 981 (4th Cir. 1987), the Fourth Circuit addressed the doctrine of laches and the equitable nature of ERISA actions. There, the plaintiffs brought an ERISA claim that their employer "breached its duty under [a] pension plan to provide the plaintiffs with their vested rights." *Id.* The court noted that although "actions under ERISA are equitable," for "purposes of the applicable limitations period" the action was brought "under ERISA and is governed by that statute." *Id.* The court observed that ERISA provides no explicit limitation period for bringing a private cause of action, and held that Maryland's three-year limitations period for contract actions applied to the plaintiffs' claim regarding vested rights. *Id.* ("[V]iolation of the vesting provisions of this plan, like an analogous breach of contract action, constituted a series of successive breaches of the nonforfeiture provisions of ERISA," and a "three year limitation period should thus be applied.").

The Court in *Dameron* included a footnote providing that on remand, if claims were raised that the defendants breached their fiduciary duty under ERISA, the "district court may decide in that case that the equitable doctrine of laches is the most appropriate limitation period for purposes of borrowing from state law." *Id.* at 981 n.6. The Defendants here assert a reaching argument that this Court should read *Dameron* to permit it to apply the doctrine of laches to bar the Plaintiffs' claims. But *Dameron* applied Maryland's three year statute of limitations to the plaintiffs' claim that a plan violated ERISA. *Id.* at 981. The Plaintiffs here do not allege a breach of fiduciary duty, but rather assert that Marriott's pension scheme, which involved deferred stock options, violated ERISA. Like the claim governed by the three-year limitations period in *Dameron*, the Plaintiffs' claim is that Marriott violated vesting requirements and

17

otherwise violated ERISA. Therefore, the doctrine of laches does not apply to their claims, but instead, as discussed above, a three-year statute of limitations applies. Accordingly, the Court denies Marriott's Motion for Summary Judgment [ECF No. 97] on the doctrine of laches, and grants Plaintiffs' Cross-Motion for Summary Judgment [ECF No. 100] on this issue.

### III. Release of Claims

The Defendants argue that Plaintiff Steigman's claims are barred "because the three year statute of limitations began to run, at the latest, when he signed the release and termination agreement, which was effective November 30, 1990." Defs.' Summ. J. 43, ECF No. 98; *Id.*, Ex. 34 (release agreement). In the release, Steigman agreed to "waive and release" Marriott and "various benefit plans and administrators from any claims or causes of action of whatever nature he may have, or in the future may have regarding his employment or the termination of his employment and the payments and benefits received in connection with his employment and the termination of employment." *Id.* ¶ 9. The release agreement also indicates that "Mike Steigman acknowledges that he has reviewed this agreement with an attorney of his choice and he understands all the terms of this agreement and voluntary enters into this agreement." *Id.* ¶ 18.

The Defendants maintain that "[h]ad Steigman enlisted an attorney as alleged in the release, he would have reviewed and shared, or at least discussed with his attorney, the Prospectuses, which clearly indicated that ERISA's vesting provisions did not apply to his deferred stock bonus awards." Defs.' Summ. J. 44, ECF No. 98. They claim that a "reasonable person, exercising due care, should have discovered the facts forming the basis" of Steigman's cause of action at the time of, or shortly after, he signed his release in 1990. *Id.* The Plaintiffs, however, note that Steigman "knew nothing about his ERISA injuries at the time he signed the release," and that "Marriott provides no evidence that it made available the wealth of data

18

necessary" for a "meaningful" evaluation of his potential ERISA claims, even with an attorney. Pls.' Opp'n & Cross-Motion 49, ECF No. 101.

Marriott cites three cases involving materially different causes of action to support its argument that Steigman's release effectively waived his ERISA claims and bars his current action, while the Plaintiffs merely note that these cases are inapposite. *See McCorkle v. DPIC Companies, Inc.*, 13 Fed. App'x 131, 134 (4th Cir. 2001) (applying West Virginia law's applicable statute of limitations to a tort claim and concluding that the statute of limitations began to run when the plaintiff executed a release); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136-37 (5th Cir. 1992) (in an employment termination case brought under a Texas statute, concluding that the latest date on which the plaintiff received notice of his discharge was the date he executed a release); *Grain v. Trinity Health*, No. 03–72486, 2009 WL 3271237, at *4 (E.D. Mich. Oct. 13, 2009) (holding that a release agreement signed more than four years prior to the lawsuit barred a race discrimination claim brought pursuant to 42 U.S.C. § 1981). Here, Steigman's 1990 release agreement included a waiver provision waiving "any claims or causes of action of whatever nature he may have, or in the future may have regarding his employment or the termination of his employment and the payments and benefits received in connection with his employment and the termination of employment." Defs.' Summ. J. 43, Ex. 34 ¶ 9. It also notes that he "reviewed this agreement with an attorney of his choice and he understands all the terms of this agreement and voluntary enters into this agreement." *Id.* ¶ 18. Marriot's argument that Steigman's signature on the 1990 release constitutes a waiver of his ERISA action requires the Court to infer without any factual support that Steigman knowingly and voluntarily waived the ERISA rights contested in this action. The Court will not make such an inference without legal

19

or factual support to do so, and will deny Marriott's Motion for Summary Judgment [ECF No. 97] on the issue of Steigman's release.

## IV. Class Certification

At the hearing on June 7, 2013, the Court advised the parties that it was prepared to rule on all of the pending motions, or could decide all motions other than the Motion for Class Certification [ECF No. 80] in order to provide the parties additional time to attempt a voluntary resolution of this case. The parties were agreeable to this course of action and, accordingly the Court will defer ruling on that motion for ninety days. If no voluntary resolution is reached, the Court will enter its ruling on the issue of class certification promptly thereafter.

## CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment [ECF No. 97], grant Plaintiffs' Cross-Motion for Summary Judgment [ECF No. 100], and defer for ninety days decision of Plaintiffs' Motion for Class Certification [ECF No. 80]. A separate Order follows.


Date: <u>August 9, 2013</u>                  _____/s/_____
                                                                 ROGER W. TITUS
                                             UNITED STATES DISTRICT JUDGE